**Paul G. SIGSBEE and Cynthia I. Sigsbee, Appellant[s]-Defendant[s] Below,**

v.

**Charles SWATHWOOD, Jr., and Donna Swathwood, d/b/a Osolo Market, Appellee[s]-Plaintiff[s] Below.**

No. 3–380A87.

Court of Appeals of Indiana, Third District.

April 27, 1981.

John J. Lorber, May, Oberfell, Helling, Lorber, Campiti & Konopa, South Bend, for appellants-defendants.

Stephen R. Bowers, Elkhart, for appellees-plaintiffs.

STATON, Judge.

Paul and Cynthia Sigsbee were the lessors of a building used by Charles and Donna Swathwood as lessees to conduct their grocery business under the name and style of Osolo Market. The Swathwoods brought this action to cancel their lease and to recover damages which they allege resulted from the wrongful competition and interference with their business. Later, the Sigsbees filed a counterclaim for rent under the lease. After a court trial, the trial court held that the Swathwoods were entitled to abandon the grocery store premises and were entitled to damages in the sum of $4,000.00. The Sigsbees bring this appeal and present these issues for our review:

(1) Whether there was sufficient evidence to support a finding of constructive eviction; and,

(2) Whether the trial court erred in the determination of damages.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

### Evidence and Findings

The Sigsbees owned two separate buildings with common parking areas in Osolo Township, Elkhart County, Indiana. One building was leased to the Swathwoods for their Osolo Market, a small grocery store. The other building contains two business enterprises, a variety store and a beauty shop.

On August 1, 1976 the Sigsbees and the Swathwoods entered a five year lease. The total rent to be $15,000 payable at $250 on the first of each month. This lease provided the following:

"LESSORS promise and covenant, during the period of this lease to perform the following acts and to do the following things:

"1) To give LESSEES quiet and peaceable possession of said premises during the term of this lease.

"2) To maintain the exterior walls and roof of the building on said premises during the term of this lease.

"LESSORS and LESSEES agree that LESSORS may enter up and inspect said premises at all reasonable times during the period of this lease."

The record is replete with evidence establishing one thing clearly: during the occupation of the Osolo Market by the Swathwoods, there was a great deal of personal friction between the Swathwoods and the Sigsbees.

From the initiation of the lease in August of 1976, to the date of the abandonment of the Osolo Market by the Swathwoods in February of 1979, the roof of the Osolo Market experienced periodic leaks. There was extensive, conflicting evidence presented by the parties regarding the leaks from the roof. There was no dispute that the Swathwoods complained to the Sigsbees several times concerning the leaking roof; nor, that the Sigsbees attempted to patch the roof on several occasions. The Swathwoods testified that the worst problems with the leaks occurred in 1976 and 1977 when they were unable to obtain any cooperation from the Sigsbees.

There was also great friction over the right of the Sigsbees to inspect the Osolo Market under the provisions of the lease. As cited above, the terms of the lease specifically provided for inspections "at all reasonable times during the period of this lease." In February of 1978, the Sigsbees, the Swathwoods, and their attorneys resolved this dispute at a meeting. Though the Sigsbees had been inspecting the Osolo Market once a week prior to this meeting, the Sigsbees and Swathwoods agreed that Mr. Sigsbee would inspect the building—still once a week—but on the same day and at the same time each week and only when Mr. Swathwood was present. According to Mr. Swathwood, this arrangement "worked out fairly well."

In May of 1978, an accident involving a car parked in front of the variety store and beauty shop building caused damage to the front of the variety store. Soon thereafter, the Sigsbees erected a parking barrier between the variety store and beauty shop building and the Osolo Market building. The Sigsbees' tract of land is located at the intersection of two highways with the Osolo Market located on the corner of the intersection. The variety store and beauty shop building is located behind the Osolo Market. Thus, the parking barrier did not prevent access to the Osolo Market from the high-

ways, it only interfered with traffic flow between the buildings. Since the Sigsbees left a gap in the barrier of 27 feet, auto traffic was not completely blocked from traveling between the buildings. Within a couple of weeks of the erection of the parking barrier, Mrs. Swathwood strategically placed three steel barrels tri-secting the 27 foot gap and thereby changed the partial barrier to complete barrier to auto traffic.[1] At trial, the Swathwoods presented evidence of the parking barrier interfering with the traditional flow of auto traffic, particularly that of semi-truck and trailers, through the common parking areas. Testimony varied, but this interference was credited with a resulting reduction in the number of customers ranging from one-third to three-fourths of prior business.

The evidence presented a profitable picture for the Osolo Market in 1976 and 1977. From the start of 1978, however, the store experienced a severe decline in overall sales. From a net income of $6,700 in 1977, the net profit of the Osolo Market was reduced to $730 in 1978. The Swathwoods abandoned the Osolo Market in early February, 1979.

The trial court made the following findings of fact and conclusions of law:

"1.   As of the 4th day of February, 1979, Plaintiff's [sic] were entitled to elect a recourse of abandonment of the property by virtue of breaches of the Lease Agreement by the Defendant.

\*       \*       \*       \*       \*       \*

"3.   That the Defendant's [sic] failure to timely repair the roof to correct the leaks constitutes a breach of Defendant's [sic] covenants, 'to give Lesee's [sic] quiet and peaceable possession of said premises', and 'to maintain the exterior walls and roof of the building on the said premises'.

---

1. The Sigsbees testified the purpose of the parking barrier was to direct parking so that an accident did not reoccur. Mrs. Swathwood testified she placed the barrels in the opening

because Mrs. Sigsbee had told her not to have these trash barrels next to the Osolo Market building and that there was no other place to put the barrels.

"4. That the Defendant's [*sic*] erection of the barricade to traffic constitutes a breach of the Defendant's [*sic*] obligation under the Lease 'to give Lesee's [*sic*] quiet and peaceable possession of said premises';

"5. That the Defendant's [*sic*] methodology and frequency of inspection of the premises was in breach of the Defendant's [*sic*] obligation under the Lease 'to give Lesee's [*sic*] quiet and peaceable possession of said premises':"

\* \* \* \* \* \*

"8. That Plaintiff's [*sic*] as a result of Defendant's [*sic*] breaches of the Lease sustain an income loss for 1978 of $5,970.00 and for the month of January, 1979, an additional $497.00 upon which loss Plaintiff's [*sic*] would have paid taxes of approximately $1,293.00;"

\* \* \* \* \* \*

"12. That Plaintiff's [*sic*] are entitled to judgment for $6,467.00 lost income, less taxes which they would have paid upon said income, less repairs done by the Defendant's, [*sic*] less rental monies withheld for snow removal from Defendant's, [*sic*] less labor for repairs and unpaid rent for a net of $4,000.00."[2]

Upon the above findings and conclusions, we reverse and vacate numbers 1, 8, and 12; remand for further proceedings consistent with this opinion numbers 3, 4, and 5; and, affirm the remaining portions of the judgment.

2. At the trial, the parties contested issues regarding the operation of the variety store by the Sigsbees, the costs of snow removal, the surrendering of possession of the Osolo Market, and the costs to repair equipment in the Osolo Market after the Swathwoods had abandoned the premises. These issues were resolved in the findings and conclusions of the trial court, numbers 2, 6, 7, 9, 10, and 11 (numbers omitted above). These issues, not raised upon appeal and thus not addressed by this Court, are affirmed as resolved by the trial court.

## II.

### Constructive Eviction

■ The first allegation of error by the Sigsbees is insufficient evidence to support a finding of constructive eviction.[3] When reviewing a challenge to the sufficiency of the evidence, this Court will not weigh the evidence nor judge the credibility of witnesses. *Rosenberg v. Village Shopping Center, Inc.* (1968), 251 Ind. 1, 238 N.E.2d 642; *Lawrence County Comm'rs v. Chorely* (1979) Ind.App., 398 N.E.2d 694. Where the trial court has made findings of fact and conclusions of law, we consider only that evidence and the reasonable inferences therefrom which supports the judgment. *Blade Corp. v. American Drywall, Inc.* (1980) Ind.App., 400 N.E.2d 1183; *Shahan v. Brinegar* (1979) Ind.App., 390 N.E.2d 1036. This Court will set aside the findings of fact and conclusions of law of the trial court only where "clearly erroneous." Ind.Rules of Procedure, Trial Rule 52(A); *Blade Corp. v. American Drywall, Inc., supra.* We find the trial court's determination with respect to this issue to be clearly erroneous.

Constructive eviction, recognized in Indiana as early as 1885, *see Avery v. Dougherty* (1885), 102 Ind. 443, 2 N.E. 123; was first definitively outlined in *Talbott v. English* (1901), 156 Ind. 299, 305–306, 59 N.E. 857, 860, as a breach by the lessor "so direct and positive, and so substantial and permanent in character as to operate as a material and effectual exclusion of the tenant from the beneficial enjoyment of some part of the leased premises." In *Talbott v. English*, the Court was faced with the issue of whether the lessor's actions amounted to construc-

3. In fact, the trial court found the Swathwoods entitled to abandon the Osolo Market—without further obligation to pay rent—due to the breaches of the covenants of the lease by the Sigsbees. As explained subsequently, for the trial court to make this conclusion, the trial court necessarily would have to find the Swathwoods to have been constructively evicted by the acts of the Sigsbees. Thus, though not specifically stated by the trial court, the Sigsbees properly address this issue as whether there was sufficient evidence to support a finding of constructive eviction.

tive eviction or were, in fact merely trespass. Expanding upon the above definition, the Court stated the following:

"Eviction is either actual or constructive, actual when the tenant is deprived of the occupancy of some part of the demised premises, and constructive when the lessor, without intending to oust the lessee, does an act by which the latter is deprived of the beneficial enjoyment of some part of the premises, in which case the tenant has his right of election, to quit, and avoid the lease and rent, or abide the wrong and seek his remedy in an action for the trespass. But in every case of constructive eviction the tenant must quit the premises if he would relieve himself from liability to pay rent; and whether or not he is justifiable in so quitting is a question of fact for the jury."

*Id.* at 307–308, 59 N.E. at 860. We emphasize the Court's language, "in every case of constructive eviction the tenant must quit the premises . . . ." *Id.* Imposed upon the lessee is the further limitation that the abandonment must occur within a reasonable time after the lessor has committed the act or omission considered to be the constructive eviction. *Indiana State Highway Comm'n v. Pappas* (1976), 169 Ind.App. 611, 349 N.E.2d 808; *General Industrial & Manufacturing Co. v. American Garment Co.* (1920), 76 Ind.App. 629, 128 N.E. 454; Annot., 91 A.L.R.2d 638 (1963). Within a reasonable time means within a reasonable time under the circumstances of the case. That is, certain circumstances extend the time deemed to be reasonable. *See, e. g., American National Bank & Trust Co. v. Sound City, U. S. A., Inc.* (1979), 67 Ill. App.3d 599, 24 Ill.Dec. 377, 385 N.E.2d 144 (delay of three months excused for reliance upon lessor's promise to repair); *Hartenbauer v. Brumbaugh* (1920), 220 Ill.App. 326 (delay of four months excused for lessee's physical disability); *General Industrial & Manufacturing Co. v. American Garment Co., supra* (delay of four months excused where lessor's breach was of an uncertain and continuing nature).

■ Generally, whether the abandonment was made within a reasonable time is a question of fact for the trier thereof. *General Industrial & Manufacturing Co. v. American Garment Co., supra*; Annot., 91 A.L.R.2d 638 (1963). Where, however, reasonable minds could not differ or the facts are undisputed, the question is one of law. *Automobile Supply Co. v. Scene-In Action Corp.* (1930), 340 Ill. 196, 172 N.E. 35; *Giddings v. Williams* (1929), 336 Ill. 482, 168 N.E. 514; *Palumbo v. Olympia Theaters, Inc.* (1931), 276 Mass. 84, 176 N.E. 815; *Merritt v. Tague* (1933), 94 Mont. 595, 23 P.2d 340; *Leider v. 80 William St. Co.* (1965), 22 App.Div.2d 952, 255 N.Y.S.2d 999; *Maki v. Nikula* (1960), 224 Or. 180, 355 P.2d 770.

■ In summary: If an act or omission by the lessor materially deprives the lessee of the beneficial use or enjoyment of the leased property, the lessee may elect to abandon the property and avoid further obligations under the lease. If the lessee so elects, the abandonment of the property must occur within a reasonable time after the act or omission.

■ With the above guidelines, we address the trial court's ultimate findings and conclusions. Stated briefly, the trial court concluded the Swathwoods were constructively evicted and thus "were entitled to elect a recourse of abandonment of the property by virtue of breaches of the Lease Agreement . . ." which included: 1) the "erection of the barricade to traffic . . .;" 2) the "methodology and frequency of inspection of the premises . . .;" and, 3) the "failure to timely repair the roof . . . ." We find the trial court's conclusion to be clearly in error. For the purpose of the resolution of this issue, we assume the actions and omissions of the lessors-Sigsbees listed by the trial court as breaches of the lease's covenants to be correct conclusions.

First, the trial court found the erection of the parking barrier by the Sigsbees to be a breach of the covenant for quiet enjoyment. The record establishes without conflict the barrier to have been placed on Memorial Day weekend of 1978. The Swathwoods

did not abandon the Osolo Market until February of 1979, approximately eight months later.

Secondly, the trial court found the Sigsbees methodology and frequency of inspection to be a breach of the covenant for quiet enjoyment. We note, however, the record establishes without conflict this alleged breach to have been resolved at the February 1978 meeting between the parties and their attorneys. At the meeting, the Swathwoods specifically agreed to the time and method of all subsequent inspections. Further, Mr. Swathwood testified that the inspections after the meeting were made "at a reasonable time" and "worked out fairly well." The Swathwoods did not abandon the premises until February of 1979, approximately one year after the meeting and after the alleged breaches had ended.

Thirdly, the trial court found the failure of the Sigsbees to timely repair the leaks in the roof to be a breach of both covenants. The record establishes the leaks in the roof dating to the initiation of the lease in Au-

gust of 1976. The Swathwoods did not abandon the property until February 1979, two and one-half years later.

The three breaches the trial court found to justify the Swathwoods' abandonment occurred 8 months, 1 year, and 2 and ½ years prior to the date of their abandoning the Osolo Market. The record is silent upon any circumstance which might explain or excuse such extended delay. Even considering the best supported and most thoroughly established breach of covenant—that of failure to repair the roof[4]—and providing a generous allowance for time involved in requests for repair, attempts to repair, further requests for repair, further attempts to repair, further requests, further attempts, *etc.*, the Swathwoods sat too long on their right to abandon the premises.[5] Thus, rather than hatch their right of election, they squashed it. We conclude as a matter of law—since the facts are undisputed and reasonable minds could not differ—the Swathwoods did not elect to abandon the premises within a reasonable time.[6]

4. Taking only that evidence which supports the judgment, the record establishes the roof leaked as follows: 1) in the southeast part of the store around the air conditioner; 2) in the center of the store in front of the milk cooler; 3) over the scales at the meat counter; 4) over the soda pop cooler at the front-center of the store; 5) two leaks in the center row of light fixtures midway in the store; and 6) over the frozen food case. The record establishes the following problems arising therefrom: 1) the leak over the frozen food case caused a dark brown and yellow ice to form on the packaged food making it unattractive and hard to sell; 2) buckets kept on top of the freezer to catch the leaking water inconvenienced customers attempting to open the freezer; 3) the leak over the meat counter and scales discouraged customers from buying meat; 4) the leaks over the lights worried the Swathwoods as an electrical and fire hazard and they disconnected the lights; 5) the leak over the soda pop cooler caused rust to form around the seams of the cans discouraging customer purchase; and 6) buckets and papers on the floor to catch water were unattractive which further discouraged customers from purchases, as well as being a danger.

5. Similarly, the record is devoid of reason—and the appellees offer none—for the delay in abandonment regarding the alleged breaches by erection of the parking barrier and the method-

ology of inspections. We reemphasize, for the resolution of this issue we *assumed without so holding* that the inspections, the parking barrier, and the failure to repair the roof were sufficient—jointly or severally—to justify abandonment of the premises.

6. We recognize some may deem such result harsh. We cannot, however, allow commercial lessees to accumulate grievances over extended periods of time and then claim constructive eviction at their economic convenience. The effect of the result other than the one here reached would shift some of the economic risk of the lessees' business venture to the lessors. Further, we note the doctrine of equitable election, as its nomenclature clearly indicates, is of an equitable nature—evolving as an ameliorative judicial answer to the harshness of the common law in its treatment of lease relationships. Krieger & Shurn, *Landlord-Tenant Law: Indiana at the Crossroads*, 10 Ind.L.Rev. 591 (1977); Rapacz, *Origin and Evolution of Constructive Eviction in the United States*, 1 DePaul L.Rev. 69 (1951). Being of an equitable nature, the lessee must elect abandonment under the doctrine within a reasonable and equitable time after the act or omission of the lessor considered to be constructive eviction. The lessee must be vigilant and not slumber upon his rights. *See, Citizens National Bank v. Judy* (1896), 146 Ind. 322, 43 N.E. 259; *Thorpe*

## III.

### Damages

The Sigsbees' second allegation of error challenges the trial court's determination of damages. Though we found the evidence insufficient to support a finding of constructive eviction, the record clearly supports some of the trial court's findings and conclusions as to damages. The trial court found the Swathwoods entitled to abandon the Osolo Market. We concluded as a matter of law that they waived the right to abandon by not abandoning the premises within a reasonable time. In finding the Swathwoods entitled to abandon, however, the trial court specifically found the two covenants of the lease to have been breached. We remand for further proceedings upon these specific findings and conclusions (numbers 3, 4, and 5, *supra*).[7] These further proceedings are for the purpose of determining the individual party's damages (or set-off) regarding these findings and conclusions and must be consistent with the following guidelines.

### (a) parking barrier

■ The trial court found the erection of the parking barrier by the Sigsbees to be a breach of the covenant for quiet and peaceable enjoyment of the premises. The parking barrier was erected during the Memorial Day weekend of 1978 between the two buildings—separating the parking areas of the variety store and beauty shop from the Osolo Market parking areas. This parking barrier partially blocked the traditional flow of traffic through the common parking areas. It is essential to a correct determination of damages, however, to note the record is without conflict on the fact a twenty-seven foot gap was left in the parking barrier by the Sigsbees. Thus, the flow of traffic was not completely blocked until a couple of weeks later when Mrs. Swathwood placed three large barrels in the gap—effectively changing the partial barrier to a complete barrier.

*v. Ogle Coal Co.* (1926), 90 Ind.App. 508, 153 N.E. 423.

■ The blocking of the traditional flow of traffic could materially deprive the lessee of the beneficial use or enjoyment of the leased premises and the proper remedy would include abandonment, injunctive relief, damages or a combination thereof. *See generally, Kelly v. United States (Ct. of Claims 1930)*, 37 F.2d 767; *Edmison v. Lowry* (1892), 3 S.D. 77, 52 N.W. 583; *Pague v. Petroleum Products, Inc.* (1969), 77 Wash.2d 219, 461 P.2d 317; Annot., 12 A.L.R. 160, 175 (38 A.L.R. 1090, 44 A.L.R. 59) (1921); 49 Am.Jur.2d *Landlord and Tenant* § 307 (1970). In the present case, the remedy of abandonment was waived and any issue with respect to injunctive relief is moot. Therefore, the Swathwoods are left with the remedy of damages and they must establish those arising from the erection of a partial parking barrier.

■ Certainly, from the traditional and historical roots of the lease in property law, all legal issues regarding a lease may not be decided under the law of contracts. *See, generally*, 2 Powell on Real Property ¶ 221[1] (1977); Krieger & Shurn, Landlord-Tenant Law: Indiana at the Crossroads, 10 Ind.L.Rev. 591 (1977). The contractual nature of the lease and the applicability of the law of contracts to leases are well recognized in Indiana. *See, e. g., State v. Jordan* (1966), 247 Ind. 361, 215 N.E.2d 32; *General Industrial & Manufacturing Co. v. American Garment Co., supra*; Krieger & Shurn *supra*. Also recognized in Indiana is the fact that damages for the breach of a lease should be determined under the principles of contract law. *See, e. g., Rauch v. Circle Theatre* (1978), Ind.App., 374 N.E.2d 546; *Hirsch v. Merchants National Bank & Trust Co.* (1975), 166 Ind.App. 497, 336 N.E.2d 833.

We note—for the benefit of the trial court and the parties to this action—the following well established principles regarding damages under contract law. To be recoverable, the damages must be the natu-

7. The authority for this procedure lies in Ind. Rules of Procedure, Appellate Rule 15(N). *See State ex rel. Schmal v. Lake Superior Court, Room 3* (1975), 264 Ind. 73, 339 N.E.2d 58.

ral and proximate consequence of the breach. *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173; *Lowe v. Turpie* (1896), 147 Ind. 652, 44 N.E. 25. The damages must have been within the contemplation of the parties at the time they entered the contract. *Western Union Telegraph Co. v. Biggerstaff* (1912), 177 Ind. 168, 97 N.E. 531 (relying upon *Hadley v. Baxendale* (1854), 9 Exch. 341); *Strong v. Commercial Carpet Co., Inc.*, (1975), 163 Ind.App. 145, 322 N.E.2d 387. Further, the damages must be reasonably ascertainable and not based upon mere speculation or conjecture. *Jay Clutter Custom Digging v. English* (1979), Ind.App., 393 N.E.2d 230; *Gerwartowski v. Tomal* (1955), 125 Ind.App. 481, 123 N.E.2d 580.

One other well recognized principle under contract law is that the non-breaching party must mitigate his damages. *Louisville, New Albany and Chicago Railway Co. v. Sumner* (1885), 106 Ind. 55, 5 N.E. 404; *Lindenborg v. M & L Builders & Brokers, Inc.* (1973), 158 Ind.App. 311, 302 N.E.2d 816; 5 Corbin on Contracts § 1039 (1964). This principle has been applied to leases; and, in Indiana, the lessee must mitigate his damages where the lessor breaches the terms of the lease. *Hendry v. Squier* (1890), 126 Ind. 19, 25 N.E. 830; *Raco Corp. v. Acme-Goodrich, Inc.* (1955), 126 Ind.App. 168, 126 N.E.2d 262.

If, as the Swathwoods alleged, the parking barrier caused them damages, the Swathwoods are not entitled to damages— or the enhancement of damages—caused by their own actions. In other words, any damages attributable to the placement of the barrels so that the partial barrier became a complete barrier are not recoverable by the Swathwoods. The issue of the mitigation of damages, however, is a matter of defense with the burden on the party held liable to respond in damages (the Sigsbees). *Endsley v. Game-Show Placements, LTD.* (1980), Ind.App., 401 N.E.2d 768; *Hirsch v. Merchants National Bank & Trust Co., supra.*

### (b) leaking roof

Secondly, the trial court found the failure of the Sigsbees to effect repair of the leaking roof a breach of both the covenant to maintain the walls and roof and the covenant for quiet and peaceable enjoyment. There is sufficient evidence in the record to uphold a finding of the Sigsbees' failure to effect the repairs. This failure was a direct breach of the covenant to maintain the walls and roof. We note the indirect result of this breach may have affected the beneficial use and enjoyment of the demised property. The correct remedy, however, and the resulting determination of damages thereunder lies in an action for breach of the covenant to maintain the walls and roof. Indirect injury resulting from such breach may be recovered as consequential damages.[8]

Williston succinctly summarizes this area of law:

> "On breach of a covenant by the landlord to repair, the tenant may make the repairs himself and recover the reasonable expense of so doing. If the tenant does not make the repairs himself, the

---

**8.** Traditionally, the covenant for quiet enjoyment has served two protective functions: first, it protected the lessee from claims by parties with title to the demised premises paramount to the lessor; and secondly, it protected the lessee from unlawful entries by the lessor upon the demised premises. *See Avery v. Dougherty, supra; Indiana State Highway Comm'n v. Pappas, supra; Bowers v. Sells* (1954), 125 Ind.App. 324, 123 N.E.2d 194; 49 Am.Jur.2d Landlord & Tenant, § 336 (1970); 51 C.J.S. Landlord & Tenant, § 323 (1968). This covenant is also found to protect the possessory interests of the lessee in the beneficial use and enjoyment of the demised property. *Nate*

*v. Galloway* (1980), Ind.App., 408 N.E.2d 1317; *Kostas v. Kimbrough* (1965), 137 Ind.App. 89, 205 N.E.2d 170; 2 Powell on Real Property, ¶ 225[3] (1977). In the present case, we do not hold that the failure to make repairs is not a breach of the covenant for quiet enjoyment. We merely hold that—under the facts of this case—the correct remedy lies in an action for breach of the covenant for maintaining the walls and roof. Any resulting injury to the Swathwoods' interest in the beneficial use and enjoyment of the premises was a consequence of the failure to repair and, therefore, should be determined as consequential damages.

ordinary measure of damages is the difference in the rental value of the premises without the promised repairs and with them.

"If, however, the repairs involves slight expense, the measure of damages in such a case may properly be the expense of making them. Thus, where a few window panes are broken in a house in a northern latitude, although the rental value of the premises kept in that condition might be very slight, the measure of a tenant's damages if his landlord broke a covenant in the lease to repair, could hardly be based on this diminished rental value, but rather on the expense of making the repairs. And if the premises cannot be used until the repairs are made, the value for this period may also be recovered.

"Other consequential damages may be recovered if brought within the general principles governing such recovery; but damages for injury to the tenant or his property from continued failure to make repairs cannot ordinarily be recovered because under the rule of avoidable consequences the tenant should have made the repairs himself and recovered their cost from the landlord.

"But where the tenant in justifiable reliance on the landlord's promise to repair has suffered consequential injury which was a natural and probable consequence of the landlord's unexpected default, damages for the injury may be recovered." (footnotes omitted)

11 Williston on Contracts § 1404, pp. 563–64 (3d ed. 1968).

■ The alternative remedies outlined by Williston have been approved by the courts in Indiana. The lessee may make the needed repairs and recover the cost thereof, or off-set the costs against the rent due. *Hendry v. Squier, supra; Rene's Restaurant Corp. v. Fro-Du-Co Corp.* (1965), 137 Ind.App. 559, 210 N.E.2d 385; *Olinger v. Reahard* (1947), 117 Ind.App. 172, 70 N.E.2d 436; *Ross v. Stockwell* (1898), 19 Ind.App. 86, 49 N.E. 50. Or, the lessee may sue for his "loss of bargain" (diminished rental value) under traditional breach of contract theory. *Ross v. Stockwell, supra; Taylor v. Lehman* (1897), 17 Ind.App. 585, 46 N.E. 84 *reh. denied,* 17 Ind.App. 585, 47 N.E. 230. We adopt this further limitation noted by Williston: where the repair cost is slight with respect to the decrease in the value of the "bargained for" premises, the amount recoverable by the lessee is limited to the cost of repair. *See generally, Hendry v. Squier, supra; Olinger v. Reahard, supra.*

■ The lessee may recover consequential damages for the breach of the covenant to repair. 11 Williston, *supra;* 49 Am. Jur.2d *Landlord & Tenant* § 844 (1970); 51C C.J.S. *Landlord & Tenant* § 373(5) (1968). We do not attempt to categorize those damages recoverable, but we do suggest the general principles of damages under contract law stated in the previous section.[9] We further point out that the consequential damages are limited to those occurring within a reasonable time after the breach has occurred. The lessee can "not merely continue his occupancy, suffer damage and charge his landlord therewith." *Olinger v. Reahard, supra,* 117 Ind.App. at 174, 70 N.E.2d at 436. The lessee, as previously discussed, must mitigate his damages.

### (c) inspections

■ Finally, the trial court found the inspections of the Osolo Market by the Sigsbees to be a breach of the covenant for quiet enjoyment. The evidence at trial established the Sigsbees inspected the premises once a week prior and subsequent to the February 1978 meeting of the parties and their lawyers. This record clearly does not support a finding that the inspections

9. Briefly summarized, the damages must be the natural and proximate consequence of the breach, must have been within the contemplation of the parties at the time they entered the contract, and must be reasonably ascertainable and not based upon mere speculation or conjecture.

breached the covenant for quiet and peaceable enjoyment.[10]

■ Though the record indicates the inspections caused trouble early in the term of the lease, these occasional·once a week incursions upon the leased premises by the lessor were the type of acts of trespass addressed in *Talbott v. English, supra,* where the Court stated:

"Any act of the landlord, transitory and fleeting in character, and not performed with intent to oust the tenant, must be regarded as a trespass for which damages will lie, and not as an eviction."

156 Ind. at 307, 59 N.E. at 860. Similarly, as stated in *Avery v. Dougherty, supra* :

"It is quite well settled that it is not every entry of the landlord, although wrongful, that constitutes a breach of covenant; a landlord may be a trespasser without breaking the covenant."

102 Ind. at 447, 2 N.E. at 125.

■ In an action based upon the theory of trespass quare clausum fregit, the plaintiff needs to prove: 1) the plaintiff was in possession of the land; and 2) the defendant entered the land without right. If the plaintiff proves both elements he is entitled to nominal damages without proof of injury. If the plaintiff proves any additional injury, proximately resulting from the trespass, the plaintiff is entitled to compensatory damages. *Indiana Pipe Line Co. v. Christensen* (1919), 188 Ind. 400, 123 N.E. 789; *Hawke v. Maus* (1967), 141 Ind.App. 126, 226 N.E.2d 713. The award of punitive damages in a trespass action is proper only upon a showing of fraud, malice· or oppressive conduct. *Moore v. Crose* (1873), 43 Ind. 30; *Grad v. Cross* (1979), Ind.App., 395 N.E.2d 870; *Indiana & Michigan Elec. Co. v. Stevenson* (1977), Ind.App., 363 N.E.2d 1254.

(d) lessor's set-off damages

■ Our conclusion that the lessees did not properly abandon the premises necessarily raises the corollary issue of liability for rent payments. To suspend or terminate the lessee's rental obligation, a total or partial eviction must be proved. *Avery v. Dougherty, supra; Nate v. Galloway* (1980), Ind.App., 408 N.E.2d 1317. Thus, upon remand the trial court must also determine the Swathwoods' liability for the payment of rent after their abandonment of the Osolo Market.

■ First, we note the Swathwoods had a contractual liability of $15,000 over a five year period at $250 per month under the terms of the lease. Where the lessee abandons the leased premises before the expiration of the term of the lease, the lessor is required to use such diligence as would be exercised by a reasonably prudent man under similar circumstances to relet the premises and mitigate his damages. *State v. Boyle* (1976), 168 Ind.App. 643, 344 N.E.2d 302; *Hirsch v. Merchants National Bank & Trust Co., supra.* As previously stated, mitigation of damages is a matter of defense which a party held responsible to respond in damages (the Swathwoods) has the burden of proving. *Endsley v. Game-Show Placements, LTD., supra; Hirsch v. Merchants National Bank & Trust Co., supra.* These are questions of fact. *Hirsch v. Merchants National Bank & Trust Co., supra; Carpenter v. Wisniewski* (1966), 139 Ind.App. 325, 215 N.E.2d 882. We further note that the mere attempt to relet the premises does not result in surrender and acceptance by operation of law. *State v. Boyle, supra; Hirsch v. Merchants National Bank & Trust Co., supra.*

A close analogy to the present case can be drawn from the *Hirsch* case, *supra.* In *Hirsch,* the lessee abandoned his rented office prior to the expiration of the term of

---

**10.** As stated, footnote 8, *supra,* this covenant serves the two key functions: first, to protect the lessee from third parties with title paramount to the lessor; and second, to protect the lessee from unlawful entry by the lessor. This covenant is also recognized to protect the lessee's interest in the beneficial use and enjoy- ment of the premises. The essence of this covenant goes to the lessee's possessory interest. The record does not support a finding that the inspections by the lessor disturbed that essential possessory interest of the covenant for quiet enjoyment of this commercial lessee.

the lease. The lessor attempted to relet the office space without success. Finally, the lessor took over the office space for its own business purposes. The *Hirsch* Court found the lessee's rental obligation to end upon the date the lessor took over the office space. In the present case, the record contains evidence of the Sigsbees' attempt to relet the Osolo Market by placing newspaper advertisements. Upon failure to relet, the Sigsbees opened the Osolo Market for business themselves.

■ The trial court must determine the Swathwoods' obligations for rent under the above guidelines. The burden is upon the Swathwoods to show that the Sigsbees did not use the requisite diligence. Clearly, once the Sigsbees reopened the market for their own profit, the lease and the Swathwoods' liability thereunder terminated.

Affirmed in part, reversed and vacated in part, and remanded for further proceedings consistent with this opinion.

GARRARD, J., concurs.

HOFFMAN, P. J., concurs in result.